# EXHIBIT 1

| EEOC Form 5 (11/09) | | | |
|---|---|---|---|
| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br>☐ FEPA<br>☒ EEOC | Agency(ies) Charge No(s):<br>523-2011-00508 | |

| Connecticut Comm. On Human Rights & Opportunities | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Mr. Christopher McAllister | (347) 581-7399 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 160 West 106th St, Suite 6c, New York, NY 10025 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| BRIDGEWATER ASSOCIATES, LP | 500 or More | (203) 226-3030 |

| Street Address | City, State and ZIP Code |
|---|---|
| , One Glendinning Place, Westport, CT 06880 | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 11-09-2010  Latest: 11-09-2010
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

I believe I have been a victim of unlawful employment discrimination because of my race and color, Black African American, in violation of Title VII of the Civil Rights Act of l96f4, as amended and all applicable state statutes.

See Attached Statement

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

| Date | Charging Party Signature |
|---|---|
| | |

PRIVACY ACT STATEMENT: Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.    FORM NUMBER/TITLE/DATE. EEOC Form 5, Charge of Discrimination (11/09).

2.    AUTHORITY. 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.    PRINCIPAL PURPOSES. The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.    ROUTINE USES. This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.    WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION. Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

**A Statement of Facts is as follows:** Upon information and belief, Claimant alleges as follows:

1. Respondent has a long-standing pattern and practice of systematically discriminating against African-Americans and other minorities. Respondent discriminated against Claimant because of his race.

2. Claimant is a resident of the State of New York.

3. Claimant is an African-American male.

4. Claimant received his B.A from Duke University in Sociology, Pre-Law, and Robotics. Among other qualifications, Claimant is familiar with more than ten software programming languages, experienced in over four major computer operating systems, and skilled in every major hardware industry platform vendor. Claimant began his career overseeing domestic and international networks as a classified United States Government employee. Following his government employment, he held a variety of executive positions in technology infrastructure, architecture, and security companies, including National Practice Director of Unisys Corporation and Chief Operating Officer of DigiClique.

5. At all times material, Respondent is a foreign limited partnership duly existing by virtue of the State of Delaware.

6. At all times material, Respondent is a foreign limited partnership authorized to conduct business in the State of Connecticut.

7. At all times material, Respondent is an investment company that manages approximately $90 billion USD in global investments for a wide array of institutional clients and the largest hedge fund in the world.

8. Respondent systematically denies employment, advancement, and mid to high level positions to African-Americans.

9. In early June, 2010, Rebel Ely, a Senior Management Associate working for Respondent, contacted Claimant regarding the job opening for the Head of Trading Security at Respondent's Trading Department and suggested he submit his resume and cover letter to her.

10. Ms. Ely had frequently told Respondent that they failed to employ African-Americans (and other racial minorities) in middle and upper level positions.

11. On or about June 16, 2010, Claimant sent his resume and cover letter to Ms. Ely regarding possible opportunities with Respondent as requested.

12. Shortly thereafter, Ms. Ely forwarded Claimant's email, cover letter, and resume to Anand Mehta, the Hiring Manager for the Head of Trading Security position, and copied Janet Kang, an internal recruiter employed by Respondent who was responsible for security-related hiring.

13. Mr. Mehta and Ms. Ely spoke many times about Claimant's qualifications for the Head of Trading Security position, and each time Mr. Mehta informed Ms. Ely that he would contact Claimant to schedule an interview "as soon as possible" because the Head of Trading Security was a "critical role" he needed to fill. Ms. Ely further informed Mr. Mehta that Claimant would be an excellent diversity hire since Respondent did not have any African-Americans in management positions.

14. When Mr. Mehta failed to follow up with Claimant within the timeframe Mr. Mehta had indicated, Ms. Ely asked Mr. Mehta if he was still interested in considering Claimant for the Head of Trading Security role. Mr. Mehta assured Ms. Ely that he was interested in

Claimant and asked Ms. Ely to schedule a time for him to conduct a phone-screen interview with Claimant. Ms. Ely tried numerous times to schedule the requested phone-screen interview, but each time Mr. Mehta cancelled, rescheduled or was "too busy" to call Claimant.

15. Noticing Mr. Mehta's pattern, Ms. Ely finally told Claimant that he should contact Respondent's Head of Security, Aaron Graham, directly either on his cell or at his email address to follow up on his candidacy for the Head of Trading Security position.

16. From June 17, 2919 through July 1, 2010, Claimant made numerous attempts to follow up with Respondent.

17. On or about July 2, 2010, Janet Kang called Claimant and apologized on behalf of Respondent that contact had not been more diligent and forthcoming. Ms. Kang interviewed Claimant via telephone, explained the requirements for, and the nature of, the Head of Trading Security position at a high level, and promised to email Claimant a full job description by the end of the day.

18. Four days later on July 6, 2010, having never received the job description as promised, Claimant sent Ms. Kang a follow up email and left multiple voicemails for Ms. Kang. Later that day, Ms. Kang apologized and emailed Claimant the Head of Trading Security job description and stated that a person named Brett Settles, another internal recruiter focused on hiring for security-related roles and employed by Respondent, would follow up with Claimant to schedule a telephone interview for the second week of July 2010 with the hiring manager for the job, "Anand" (Mr. Mehta).

19. On or about July 12, 2010, Mr. Settles sent Claimant an email inquiring about his availability for a telephone interview.

20. The following day, on July 13, 2010, Mr. Settles and Claimant confirmed the telephone interview with Mr. Mehta for July 15, 2010 via email.

21. On or about July 15, 2010 Claimant had his telephone interview with Mr. Mehta which lasted about 20 minutes. During the call, Mr. Mehta indicated to Claimant that interview had gone well and that he wanted Claimant to come to Respondent's Westport, Connecticut offices for additional interviews, and Claimant agreed he was interested in continuing the interview process.

22. On or about July 19, 2010, Mr. Settles sent Claimant an email, copying Ms. Kang, stating their desire to interview Claimant for the Head of Trading Security position and requesting his availability, travel arrangement requirements, compensation requirements, and his completion of two personality tests, a "Team Dimensions Profile" and a "Myers Briggs Type Indicator".

23. On or about July 20, 2010, Claimant complied with each of the aforementioned requests. Later that day, Mr. Settles indicated that he had received Claimant's email and would proceed to schedule his interview day at Respondent's Westport offices.

24. On or about July 27, 2010, Mr. Settles emailed Claimant to confirm he had scheduled Claimant's "House interview for Thursday, August 5th at 9:30 AM EST at our Ford Road location (25 Ford Road Westport, CT 06680)" and requesting Claimant email him "the address that you would like the car service to pick you up at on the morning of your interview." Mr. Settles also attached Claimant's personality test results to the email. Claimant responded to Mr. Settles' email with his logistical pick up information.

25. On or about July 30, 2010, Claimant emailed Mr. Settles to confirm receipt of the email stating his pickup information. Ms. Kang responded by email and confirmed receipt and

asked Claimant if he had any additional questions. Claimant inquired as to whom he would be interviewing with so that he could be better prepared.

26. Ms. Kang replied later that day via email stating: "They are a mix of security team members as well as some people who are in Senior Management Associate roles.

> Michael Breu & Rob Kurtz
> Will Abecassis & Andrew Baron
> Anand Mehta
> Lloyd Hession & Dave Wong
> Bryan Langley"

27. On or about July 31, 2010, Claimant discovered doing interview research online that Bridgewater's Trading Director, Steve Oristaglio, had resigned from his employment at Respondent.

28. On or about August 2, 2010, Claimant called Ms. Kang and indicated that he had a couple of additional questions to ask her before his interview. Claimant received no response to his voicemail message.

29. On or about August 4, 2010, Claimant called Ms. Kang again to indicate that he had a couple of additional questions before his interview. Again, he received no return call.

30. Later that day, on August 4, 2010, Claimant received an email from Mr. Settles confirming "Our car service will be picking you up tomorrow morning at 8:00 AM and bringing you to our Glendinning [Westport] location."

31. Later that day, Claimant emailed Ms. Kang again asking for a brief phone call to sync up prior to his interview. She responded via email and they agreed to have a telephone conversation later that day.

32. Ms. Kang called Claimant as promised, and Claimant stated that he was aware that the Trading Department Director, Steve Oristaglio, had resigned from the company.

Claimant asked Ms. Kang if Mr. Oristaglio's departure would affect his candidacy in any way. Ms. Kang informed Claimant that 1.) it absolutely would not because the role still needed to be filled eventually, and 2.) even if Mr. Oristaglio's departure somehow affected the Head of Trading Security role, she had quite a few additional positions with very similar, if not identical, descriptions that Claimant would be appropriate for from a Security perspective (Back Office, Operations, etc) and a few more from a Network and Operations perspective as well. Claimant stated that this was good news and that he looked forward to meeting with them in less than 24 hours.

33. Later that same day, August 4, 2010, Janet Kang called Claimant and said that she was very apologetic but that Mr. Settles "never made the appropriate effort to schedule a conference room to interview in", and as such there was absolutely no place to interview Claimant anywhere in their buildings spanning across their multiple campus locations. Ms. Kang said she needed to postpone Claimant's interview indefinitely until appropriate arrangements could be made and requested additional future dates when he might be available to reschedule the interview.

34. On August 5, 2010, Claimant emailed Ms. Kang and provided her with his availability for rescheduling the interview.

35. Later that day, Ms. Kang thanked Claimant via email for being understanding.

36. Eight days later, on August 13, 2010, Claimant received a voicemail message from Mr. Mehta who called from his cell phone to state that the "Security Czar/Associate position in Trading was temporarily on hold for a couple of weeks due to some departmental integration."

37. On or about September 16, 2010 Claimant emailed Ms. Kang and requested a status update since he had had no contact from her whatsoever since August 5th, 2010. Claimant further inquired about: 1.) the other positions which Ms. Kang had previously indicated were available within Respondent, 2.) a possible timeline on where she believed his candidacy stood and 3.) how they could best make progress.

38. On September 24, 2010, Ms. Kang responded to Claimant's prior email stating "[w]e've placed the role internally and the security team has been designing a new org structure. Though the role we discussed (a version of it) has been filled, I would like to pass your resume on for consideration with the new hiring manager. I'm planning to check in with him today so should have a better sense of what roles might be suitable. "

39. From September 25, 2010 through October 11, 2010 Claimant repeatedly attempted to contact Ms. Kang for an update on his candidacy but his efforts were ignored and no one responded to him.

40. Three weeks later, on October 12, 2010, Claimant received an email from Ms. Kang indicating that she had been busy and was in a training class and that she would try to contact Claimant at some point if she got a break in the class.

41. A week later, on October 19, 2010, Mr. Settles contacted Claimant by email and stated "I am writing you to gain your availability for next week for a call as discussed with Janet [Kang]. Could you please send me some dates and times that would work best for you to speak for about 45 minutes next week?" Claimant called Mr. Settles and responded with his schedule and his availability for a call.

42. Three days later, on October 22, 2010, Mr. Settles called and left a message asking Claimant to call him. Claimant responded and left Mr. Settles a voicemail message.

43. Three days later, on October 25, 2010, Claimant received another email from Mr. Settles stating, "I am just following up from our phone call last week and was wondering if had a chance to check your availability for a call this week with one of our security team members."

44. Later that day, October 25, 2010 Claimant responded again with his dates and availability.

45. The next day, on October 26, 2010, Mr. Settles sent Claimant an email stating "I have scheduled your phone interview for Monday, November 1st at 3:00 PM EST with Lloyd Hession." Claimant confirmed the meeting.

46. On November 1, 2010, Claimant had his phone interview with Lloyd Hession, an employee of Respondent.

47. On Monday, November 08, 2010, Claimant emailed Ms. Kang and stated "Following a productive, open, and forward phone exchange with Lloyd I'm checking in to sync up and attempt to get a status update. Please let me know about where things stand and possible next steps when you have a moment. Thank you."

48. Later that day, Ms. Kang emailed Claimant and asked "[d]o you have time to catch up tomorrow morning?"

49. On November 9, 2010, Ms. Kang told Claimant that Respondent had concluded that since the position Claimant was originally being considered for was filled, only junior security positions were left, and that they believed Claimant was not a "fit" for any position at Respondent. When Claimant asked how this could now be the case when all of Claimant's prior interviews and test-taking had demonstrated that he was in fact a "fit" for Respondent, that they had continually progressed him through the pipeline to

additional interviews, and that what had been consistently communicated to him was quite the opposite, Ms. King indicated that it was something that they determined. When Claimant asked about the other opportunities that she had consistently indicated were available within Respondent in Security, Networking and Operations, Ms. Kang indicated that they were "no longer available" and that she "no longer believed" them to be a "good fit" for Claimant's background. Claimant asked if there would be other possibilities to interview in the future since he had had such positive interactions interviewing with employees of Respondent, to which Ms. Kang responded that if such opportunities arose they could be considered but that she essentially did not believe that would come to fruition.

50. Respondents' actions and conduct were intentional and intended to harm the Claimant.

51. As a result of Respondent's actions, Claimant felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

52. As a result of the acts and conduct complained of herein, Claimant has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Claimant has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Claimant has further experienced severe emotional and physical distress.

53. As a result of the above Claimant has been damaged in an amount which exceeds the Jurisdictional limits of all Lower Courts.

54. As Respondent's conduct has been willful, reckless, outrageous, intentional and/or malicious, Claimant also demands punitive damages.

Claimant seeks Back pay, front pay, all lost wages and earning capacity, punitive damages, damages for emotional distress, physical injuries, and attorney's fees.

Please contact me if you have any questions or require any additional information.

Thanking you for your courtesy and cooperation in the matter, I remain,

Very truly yours,

DEREK T. SMITH LAW GROUP, P.C.

Derek T. Smith, Esq.

Sworn to before me this
25th day of May, 2010

NOTARY PUBLIC

BRYAN SAMUEL ARCE
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY, LIC #02AR6219918
COMM. EXP. 4-5-14